# COURT OF APPEALS

OF

# NORTH CAROLINA

AT

# RALEIGH

---

THE POOLE & KENT CORPORATION v. C. E. THURSTON & SONS, INC.

No. 7321SC31

(Filed 6 March 1974)

1. **Master and Servant § 17— reason for terminating contract — non-union employees**

In a contractor's action against a subcontractor for breach of contract, there was sufficient evidence to support findings by the trial court that the reason union representatives sought to have defendant removed from the construction project, and the reason for plaintiff's action in obtaining an *ex parte* restraining order removing defendant from the project and its later action in canceling its agreement of subcontract with defendant, was because defendant's employees were not members of the local union.

2. **Contracts § 21; Master and Servant § 15— harmony clause — requiring union membership — Right to Work Law**

Clause of a subcontract in which the subcontractor agreed that all labor used by it throughout the work would be acceptable to the contractor "and of a standing or affiliation that will permit the work to be carried on harmoniously and without delay" may not be enforced against the subcontractor on the ground that the subcontractor's employees are not union members because such enforcement of the harmony clause would constitute a violation of the North Carolina Right to Work Law. G.S. 95-78; G.S. 95-80.

3. **Master and Servant § 16— termination of subcontract — collective bargaining agreements of contractor and general contractor**

Whether plaintiff contractor or the general contractor had collective bargaining agreements with unions representing their employees and, if so, what rights and remedies those agreements provided was

1

immaterial to a determination of whether the contractor had a right to terminate its contract with a subcontractor, and the court's findings as to such agreements were mere surplusage.

APPEAL by plaintiff from *Gambill, Judge,* 5 June 1972 Session of Superior Court held in FORSYTH County.

Civil action to recover damages for breach of contract and to restrain defendant from performing further work under the contract. Defendant denied any breach on its part and counterclaimed to recover damages resulting from plaintiff's breach.

Robert E. McKee General Contractor, Inc. (McKee) was the general contractor, plaintiff was a subcontractor under McKee, and defendant was a second tier subcontractor under plaintiff performing insulation work on the North Carolina Baptist Hospital construction project in Winston-Salem, N. C. Paragraph 12 of plaintiff's contract with defendant, which was dated 27 March 1969 and in which plaintiff was designated the "Contractor" and defendant the "Subcontractor," contained the following:

"12. At all times Subcontractor shall provide competent supervision, a sufficient number of skilled workmen, and adequate and proper materials to maintain the progress required by Contractor. All labor used throughout the work shall be acceptable to the Contractor and of a standing or affiliation that will permit the work to be carried on harmoniously and without delay, and that will in no case or under any circumstances cause any disturbance or delay to the progress of the building, structure of facilities or any other work being carried on by the Contractor, Owner and/or General Contractor."

In its complaint, filed 15 December 1970, plaintiff alleged: When its contract with defendant was executed on 27 March 1969, defendant was a party to a collective bargaining agreement with a local Asbestos Workers Union affiliated with the American Federation of Labor; during the progress of defendant's work on its subcontract with plaintiff, this collective bargaining agreement expired and has not been renewed; no subsequent collective bargaining agreement has been entered into between defendant and the Asbestos Workers Local Union "or any other recognized collective bargaining unit recognized by the National Labor Relations Board"; because of a labor dispute existing between defendant and the Asbestos Workers Local

Union, representatives of the Union began picketing defendant's entrance at the Baptist Hospital construction project on 10 December 1970; as a result of this picketing, employees of plaintiff, of other subcontractors, and of the general contractor "refuse to report to work until such time as defendant either negotiates a collective bargaining agreement or desists the employment of non-union labor"; as a consequence, the construction work on the entire Baptist Hospital project has been closed down. Plaintiff alleged that defendant breached the terms of its subcontract with plaintiff "in that it has used a labor force not acceptable to the plaintiff and has not used a labor force of a standing or affiliation that will permit the work to be carried on harmoniously and without delay." Plaintiff asked that it recover of defendant "such damages for the breach of the aforesaid contract as may be assessed by the Court."

In its complaint plaintiff also alleged: On 13 December 1970 plaintiff notified defendant that "defendant's labor force was in violation of Paragraph 12 of the contract between plaintiff and defendant," and plaintiff directed defendant not to send its personnel to the construction project on the following day; plaintiff further advised defendant that "[a]ny noncompliance of this directive will cause immediate termination of contract"; defendant sent its personnel to the construction site on 14 December 1970 and refused to withdraw them; unless defendant is restrained from placing its personnel on the construction site during the continuation of its labor dispute with Asbestos Workers Local Union, the entire construction project will remain closed for an indefinite period of time; defendant's breach of contract with plaintiff, as alleged, may cause plaintiff to default under the terms of its subcontract with McKee; plaintiff will suffer irreparable damage for which it has no adequate remedy at law. On these allegations plaintiff prayed for an order restraining defendant from maintaining its personnel and equipment on the construction site.

On 15 December 1970, the court entered an *ex parte* order, finding facts from the verified complaint, directing defendant to remove immediately all of its personnel and equipment from the construction site, and restraining defendant from placing any of its personnel or equipmpent on the site pending further orders of the court. On 31 March 1971 the parties consented to a dismissal of the temporary restraining order, the judgment of dismissal expressly providing that by consenting thereto the

parties did not "waive any right they may have to assert a claim arising out of the contract between the parties."

On 26 April 1971 defendant filed answer and a counterclaim in which it alleged: On or about 24 November 1970 certain labor union agents contacted plaintiff and on 27 November 1970 plaintiff sent defendant the following telegram:

"It has been brought to our attention that the men which you have working on the hospital additions and alterations for the North Carolina Baptist Hospital, Inc. project are not working under the terms of a union collective bargaining agreement.

"If this situation causes disruption of our work on the aforementioned project it will be necessary to take immediate steps to remedy the same."

In its counterclaim defendant also alleged: Certain labor union agents procured other insulation contractors to contact plaintiff for the purpose of taking over the work that plaintiff had contracted with defendant for defendant to perform; on 15 December 1970 plaintiff wrongfully caused the injunction to issue, the effect of which was to prevent defendant from performing its part of the contract; after plaintiff had made defendant's further performance impossible, plaintiff contracted with one Starr-Davis Company to perform defendant's work; plaintiff willfully made further performance by defendant impossible and thereby breached its contract with defendant; by the acts complained of, defendant has been damaged in the sum of $95,000.00. Defendant prayed for judgment against plaintiff in that amount.

On 19 May 1971 plaintiff filed reply to the counterclaim, admitting it had sent the telegram to defendant on 27 November 1970, that on 14 December 1970 it had directed defendant not to send its employees back to the job, that the effect of the restraining order issued on 15 December 1970 was to require defendant to temporarily discontinue its work on the job, and that plaintiff had contracted with Starr-Davis Company to perform certain work on the hospital construction project. Plaintiff denied other material allegations in the counterclaim.

The parties stipulated that the issues of liability and damages be tried separately and waived jury trial on the issue of liability. Accordingly, the court, sitting without a jury, heard

evidence and entered judgment making detailed findings of fact. In addition to findings concerning the making of the contract between plaintiff and defendant dated 27 March 1969 and the inclusion of paragraph 12 therein, the court's findings of fact included the following:

"11. At various times prior to December 10, 1970, representatives of various labor unions advised representatives of Robert E. McKee, General Contractor, Incorporated and plaintiff to have the defendant removed from the construction project because its employees were not members of the local union of the Asbestos Workers Union. These union representatives went on to say that unless union members were used to perform the work of the defendant, the construction project would be shut down by the unions.

"In pursuit of this purpose, the union established a picket line at the entrance to the construction project which was reserved for the defendant's exclusive use. The picket carried a sign upon which was lettered:

" 'Notice to the public. The C. E. Thurston & Sons Co. does not meet the standard wages, economic benefits established by the Asbestos Workers Local Union No. 72.'

"12. Other entrances to the site used by the employees of plaintiff and Robert E. McKee, General Contractor, Incorporated, were not picketed. No trades other than defendant's employees worked on the site on December 10, 11, 14 and 15, 1970.

"13. At all times material, the defendant paid wages and fringe benefits to its employees on the said construction project in accordance with the schedule of wages and benefits specified in its agreement of subcontract with plaintiff.

"14. At the time of the execution of its agreement of subcontract with plaintiff, defendant was a party to a collective bargaining agreement with the local union of the Asbestos Workers Union. On or about May 1, 1969, defendant's collective bargaining agreement expired by mutual agreement and was never renewed or renegotiated. At no time after defendant began work on the said construction project in August, 1969, did it have a signed collective bargaining agreement.

"15. At no time material did the plaintiff or any labor union or other organization or person request or demand that the defendant pay higher or different wages or benefits than it was paying on the said construction project. Likewise, at no material time did the plaintiff or any labor organization or other organization or person request or demand that the defendant enter into a collective bargaining agreement with any labor union. On the contrary, the testimony established that the Asbestos Workers Union did not sign collective bargaining agreements with contractors, such as the defendant, who did not maintain a permanent place of business within the local union's geographic jurisdiction.

"16. At all times material, defendant provided competent supervision, a sufficient number of skilled workmen, and adequate and proper materials to maintain the progress required by plaintiff on the said construction project.

"17. The defendant did not follow a policy of refusing to hire employees who belonged to a labor union. On the contrary, the evidence showed that the defendant hired employees to work on the said construction project irrespective of their membership or non-membership in a labor union."

* * * * *

"20. On December 13, 1970, plaintiff caused the following telegram to be sent to the defendant:

" 'Your present labor force is in violation of paragraph 12 of standard terms of our agreement. You are therefore directed not to send such personnel to the job tomorrow. Any non-compliance with this directive will cause immediate termination of contract.'

"21. At approximately 8 A.M. on the morning of December 14, 1970, plaintiff received a telegram from defendant (plaintiff's Exhibit 6) which reads as follows:

" 'Contents of your telegram dated 12-13 is not sufficient reason to cancel our contract. Therefore we will man the job today per our contractual obligation.' "

* * * * *

"23. Defendant continued to work and on December 15, 1970, plaintiff obtained an ex parte injunction in the Gen-

eral Court of Justice, Superior Court Division of North Carolina, enjoining and restraining defendant's employees from remaining on or returning to the job site. In compliance with said order, defendant's employees left the job site and have not returned.

"24. On December 16, 1970, when defendant was no longer on the job, all trades which had failed to report for work beginning on December 10, returned to work promptly en masse.

"25. On February 11, 1971, plaintiff wrote to defendant (plaintiff's Exhibit 9):

" 'Under the provisions of Item 4 (Standard Terms and Conditions) of our Contract with you dated March 27, 1960, [sic] to perform work on the above referenced structure, you are hereby notified that said Contract is hereby cancelled.'

"26. The reason for the plaintiff's actions in issuing its telegram to the defendant on December 13, 1970, in obtaining an ex parte restraining order removing the defendant from the said construction project, and its later cancellation of its agreement of subcontract with defendant was because defendant's employees were not members of the local union of the Asbestos Workers Union.

"The plaintiff contends that it was within its rights to take such actions against the defendant under the provisions of paragraph 12 of the agreement of subcontract between the plaintiff and the defendant. The court disagrees and finds that such actions by the plaintiff were in violation of G.S. 95-79. The court finds that plaintiff breached its agreement of subcontract with defendant by ordering the defendant off the project and subsequently cancelling its agreement of subcontract because the defendant's employees were not members of a labor organization.

"If the defendant had required such membership of its employees, the defendant would have violated G.S. 95-81, and the actions of plaintiff which were predicated upon such reasons were in direct violation of the public policy of the State of North Carolina as expressed in G.S. 95-79."

As conclusions of law, the court concluded that defendant "at all times complied with the terms of its agreement of sub-

contract with the plaintiff until it was prohibited from further compliance by the plaintiff"; that plaintiff wrongfully terminated its agreement with defendant; that defendant is entitled to recover damages from plaintiff for breach of contract, the amount to be ascertained at a subsequent trial; and that plaintiff is entitled to recover nothing of defendant. On these findings and conclusions, the court adjudged that plaintiff recover nothing and that its action be dismissed, and that defendant recover from plaintiff such amount as defendant shall at a subsequent trial prove it has been damaged by plaintiff's wrongful breach of contract. Plaintiff appealed.

*Randolph & Randolph by Clyde C. Randolph, Jr. for plaintiff appellant.*

*Hudson, Petree, Stockton, Stockton & Robinson by Norwood Robinson; and Thompson, Ogletree, Deakins & Vogt by Guy F. Driver, Jr. for defendant appellee.*

PARKER, Judge.

[1] By assignments of error 4, 5, 6 and 7, plaintiff attacks the findings of fact made by the trial court in paragraphs 11, 15 and 26 of the judgment appealed from as not being supported by the evidence. While conceding that the evidence was sufficient to support a finding that members of the Asbestos Workers Union actively sought to persuade plaintiff to remove defendant from the construction project and that plaintiff had canceled its subcontract with defendant and ordered defendant off the project, plaintiff contends that this is as far as the evidence goes. In particular, plaintiff contends that there was no evidence to support the court's findings in paragraphs 11 and 26 that the reason representatives of the union sought to have defendant removed from the project, and the reason for plaintiff's action in obtaining the *ex parte* restraining order removing defendant from the project and its later action in canceling its agreement of subcontract with defendant, was because defendant's employees were not members of the local union. A review of the record, however, reveals evidence sufficient to support the challenged findings.

At the outset we note that plaintiff alleged in its complaint, filed 15 December 1970, that as a result of the picket line established by the union on 10 December 1970, employees of plaintiff, of other subcontractors, and of the general contractor,

Poole & Kent Corp. v. Thurston & Sons

refused to report for work "until such time as defendant either negotiates a collective bargaining agreement *or desists the employment of nonunion labor.*" (Emphasis added.) From this allegation, which was made by plaintiff at the very time the events complained of were taking place, it would appear that plaintiff then understood that one reason motivating the union's activities was that defendant's employees were not members of the union. That this understanding was correct was borne out by the evidence submitted at the trial.

Plaintiff's branch manager, Brian Miller, testified to a meeting which he had with union representatives on 1 December 1970 at which the union spokesman "made it clear that he wanted to see C. E. Thurston removed from the job," and expressed the hope to Mr. Miller that plaintiff "would find some way of using union personnel to do the insulation work." Mr. Miller also testified that the union representatives had "suggested that there were three contractors in the State of North Carolina who would be acceptable to them," that it was his understanding that all three had union agreements and that "the union made that clear to us when they told us that these three were acceptable to them." On recross examination, Mr. Miller testified:

> "The union told me that they wanted Thurston off the job because their people weren't union. We terminated Thurston because of the job stoppage which put us in violation of our contract with the general contractor."

Defendant's witnesses gave even stronger support to the court's findings. P. A. Winchester, general superintendent for McKee, the general contractor on the project, testifying concerning a meeting which he had about 1 December 1970 with certain union representatives, said:

> "The union representatives in that meeting made statements to us about the possibility of a work stoppage. The best I recall, if there couldn't be some agreement reached where—I believe, to the best of my knowledge, that if C. E. Thurston non-union employees continued working that there was a possibility of a work stoppage. . . . I'm sure I reported this conversation to Mr. Miller of Poole & Kent."

Joseph W. Hoffman, an official of defendant, testified to a meeting he had on 30 November 1970 with Brian Miller, plaintiff's representative, as follows:

---

Poole & Kent Corp. v. Thurston & Sons

---

"I told Mr. Miller the reason I was down here and he told me that he had at least one conversation with his Business Agent and Mr. Barber, who was the Business Agent of the Asbestos Workers, and that they wanted to have a meeting with him because we were working non-union people on the job. . . . "

*   *   *   *   *

"Miller said that he had also discussed with Thomas and Barber the fact that—asked what did they propose, and they proposed that he get another contractor, and Mr. Barber said that he would have his union contractors contact Mr. Miller concerning doing the work if he could get us off. . . .

"The only other point that we discussed, he asked me could I possibly use Mr. Barber's men, and I told him at that time that I didn't see how in the world I could do that; we had capable people on the job doing work, and it was my understanding that it would be illegal to push those people out and put somebody else's people in because of the union membership. . . . "

*   *   *   *   *

"In my meeting with Mr. Miller he told me that the union representatives said that our people weren't union people, they weren't Mr. Barber's people."

We find that the evidence sufficiently supports the trial court's findings of fact challenged by plaintiff's assignments of error 4, 5, 6 and 7, and these assignments are overruled.

[2]   Plaintiff contends that in any event the judgment against it is erroneous as a matter of law. In this connection plaintiff points to paragraph 12 of the contract by which defendant agreed that all labor used by it throughout the work would be acceptable to plaintiff "and of a standing or affiliation that will permit the work to be carried on harmoniously and without delay." Plaintiff contends that all of the evidence establishes that defendant breached this paragraph of the contract. To this, defendant responds that there is no evidence that its employees were in anywise unacceptable to plaintiff, saving only that they were not members of the union, and that under the laws of this State, particularly the North Carolina Right to Work Law, G.S. 95-78 et seq., paragraph 12 of the contract may not be lawfully

Poole & Kent Corp. v. Thurston & Sons

enforced against it under the circumstances of this case, since the only purpose and effect would be to require that defendant employ only union members on the project. We agree with the defendant.

No evidence was presented and plaintiff does not here contend that defendant's employees lacked appropriate skills, were not properly supervised, or that they failed in any manner to perform the work assigned to them diligently and efficiently. There was no evidence or contention that defendant and its employees failed to perform in a satisfactory manner that portion of the building project called for by defendant's subcontract with the plaintiff. There was no evidence or contention that defendant's employees failed to work harmoniously or that any delay was caused by the manner in which they performed their duties. All of the evidence shows that they were not acceptable to the plaintiff solely because they were not "of a standing or affiliation," i.e., union members, which would "permit the work to be carried on harmoniously and without delay." The question presented is whether, under these circumstances, the harmony clause contained in paragraph 12 may be lawfully invoked by plaintiff to establish a breach of contract by defendant sufficient to justify plaintiff's actions in removing defendant from the project and canceling the contract between them. We hold that under the laws of this State it may not.

G.S. 95-78 and G.S. 95-80 are respectively as follows:

"§95-78. DECLARATION OF PUBLIC POLICY.—The right to live includes the right to work. The exercise of the right to work must be protected and maintained free from undue restraints and coercion. It is hereby declared to be the public policy of North Carolina that the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization or association."

"§95-80. MEMERSHIP IN LABOR ORGANIZATION AS CONDITION OF EMPLOYMENT PROHIBITED.—No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer."

Enforcement of paragraph 12 of the contract by requiring that defendant remove its nonunion members from the project

and replace them with union members would result in a direct violation of the public policy declared in G.S. 95-78 and of the express prohibition contained in G.S. 95-80. Plaintiff's contention that the Right to Work Law is not applicable because the contract between the parties is not of the type declared illegal by G.S. 95-79, simply ignores the other sections of the statute noted above and involves a too restrictive application of the public policy declared by the Legislature. We hold that under the laws of this State paragraph 12 of the contract may not be lawfully enforced against defendant for the purpose which plaintiff has sought to enforce it in this case, since to do so requires a violation of our statutes. Under the facts found by the trial court and under all of the evidence in the record, there has been no showing that defendant breached paragraph 12 in any respect in which the language of that paragraph may be lawfully applied.

[3] Plaintiff has also assigned as error the admission of oral testimony as to the contents of written collective bargaining agreements between plaintiff and the unions representing its employees and between the general contractor and unions representing its employees. Plaintiff contends that admission of this testimony violated the best evidence rule, was hearsay, and allowed nonexpert witnesses to testify to their opinion as to the legal question involved. We do not pass upon this assignment of error, since in our view the testimony in question and the trial court's findings of fact related thereto were not necessary to support the judgment appealed from. The testimony to which plaintiff objects was to the effect that the collective bargaining agreements in question limited the unions' right to strike and required them to provide personnel on the employers' request, in default of which the employers had the right to hire men from the outside. The court made no findings of fact as to the contents or legal effect of the collective bargaining agreements in question, but did find as facts that "the plaintiff did not choose to institute any legal proceedings against the labor unions which represented its employees to require the unions to abide by their collective bargaining agreements with the plaintiff" (Finding of Fact No. 19), and that "if the plaintiff's employees refused to work because of any labor disputes involving the defendant, the plaintiff had remedies available to require its employees to return to work or to hire other employees" (Finding of Fact No. 27), though the court did not specify what those remedies were. In our view, whether plaintiff or the general

contractor had collective bargaining agreements with unions representing their employees and, if so, what rights and remedies those agreements provided, was immaterial to any issue in this litigation between plaintiff and defendant. Unquestionably the refusal of the union employees to continue to work on the building project while defendant's nonunion employees were also present, placed plaintiff in a difficult position. However, whether plaintiff had, or had not, effective remedies against the unions or against its own or other union employees, and if it had such remedies, whether it did, or did not, resort thereto, simply has no bearing upon whether plaintiff had a lawful right to terminate its contract with defendant. In this view of the case, error, if any occurred, in admitting testimony as to the collective bargaining agreements in question was immaterial to any issue determinative of this case, and the court's factual findings in Findings 19 and 27 were merely surplusage.

We also find no error in the court's refusal to find as a fact, as requested by plaintiff, that "[o]n December 14, 1970, plaintiff reasonably believed it was in imminent danger of suffering cancellation of its contract with McKee." Even had this been so, it furnished no legal justification for plaintiff terminating its contract with defendant.

The judgment appealed from is

Affirmed.

Judges BRITT and VAUGHN concur.